Alvin H. FRANKEL, Administrator of the
Estate of Gregory J. Gallagher,
Deceased, Plaintiff,

v.

BURKE'S EXCAVATING, INC.,

and

Rose Borkowski, Administratrix of the
Estate of Charles Borkowski, also
known as Charles S. Borkowski, De-
ceased,

and

Bryn Mawr Trust Co. and Edward Bor-
kowski, Executors of the Estate of Mi-
chael Borkowski, also known as Michael
S. Borkowski, Deceased, Defendants,

and

Allen D. WYLIE, Jr. and Jean R. Wylie
and Joseph R. Gallagher and Katherine
K. Gallagher, Third-Party Defendants.

Alvin H. FRANKEL, Administrator of the
Estate of Allen D. Wylie, III, De-
ceased, Plaintiff,

v.

BURKE'S EXCAVATING, INC.,

and

Rose Borkowski, Administratrix of the
Estate of Charles Borkowski, also
known as Charles S. Borkowski, De-
ceased,

and

Bryn Mawr Trust Co. and Edward Bor-
kowski, Executors of the Estate of Mi-
chael Borkowski, also known as Michael
S. Borkowski, Deceased, Defendants,

and

Allen D. WYLIE, Jr., and Jean R. Wylie
and Joseph R. Gallagher and Katherine
K. Gallagher, Third-Party Defendants.

Nos. 32830, 32831.

United States District Court
E. D. Pennsylvania.

June 16, 1967.

See also, D.C., 223 F.Supp. 945.

Gordon W. Gerber, Philadelphia, Pa., for plaintiff.

James J. McEldrew, Philadelphia, Pa., for defendant.

## OPINION

FULLAM, District Judge.

In these consolidated negligence actions, plaintiffs seek to recover damages by reason of the deaths of two young boys, aged seven and eight respectively, who were drowned when they fell through the ice of an old quarry or pond on property of the defendant corporation. Plaintiffs attempted to make out a case to justify the application of the legal principles set forth in Section 339 of the Restatement of Torts, which provides as follows:

"§ 339, Artificial Conditions Highly Dangerous to Trespassing Children

A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

(d)  the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

(e)  the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children."

However, in answer to specific interrogatories, the jury found (1) the defendant neither knew nor should have known that children were likely to trespass in the area where the accident occurred; (2) the defendant neither knew nor should have realized that the circumstances involved an unreasonable risk of death or serious bodily harm to the children; and (3) the defendant did not fail to exercise reasonable care to eliminate the danger or otherwise to protect the children. Since there was ample evidence to justify these jury findings, plaintiffs' present motion for a new trial must be refused, unless the jury's verdict was tainted by trial error. After carefully reviewing the record, and considering the exhaustive briefs and arguments of counsel, I have concluded that no prejudicial error has been shown, and that plaintiffs' motion for a new trial must be refused. Moreover, I am also of the opinion that the defendant's motion for a directed verdict, as to which ruling was deferred, should have been granted.

A brief review of the evidence will suffice for an understanding of the legal issues involved. The defendant corporation owned a forty-four acre property, portions of which were used for equipment storage and various forms of waste disposal. In an unused portion of the property was located an old ore-pit or quarry hole, partially filled with water. There was evidence that this pit had been in existence for one hundred years or more; indeed, there was some testimony which would seem to indicate that the depression in question may have dated back to Revolutionary War times, when iron ore was mined in that area.

This quarry hole was completely surrounded by woods, densely overgrown with underbrush and vines. It was located near the center of the forty-four acre tract of the defendant, at a distance of approximately 600 feet from the nearest point on the boundary of defendant's property. The quarry pit was invisible from the surrounding properties; indeed, there was evidence that people who had lived in the area for a considerable period, and even a police officer who regularly patrolled within the defendant's property itself, were not aware of the existence of the quarry.

There was evidence that the defendant's entire property was fenced, although there was also testimony that some of the fencing was somewhat dilapidated and that the wire was missing from a double gate at the entrance to the property. There was also evidence that the property was posted with "no trespassing" signs, the age and legibility of which are disputed.

On the day of the accident, the decedent, Gregory J. Gallagher, aged eight, was visiting at the home of his cousin, the decedent, Allen D. Wylie, III, aged seven, in a housing development known as Farm View Village; these homes were located twenty-five hundred feet or more from the quarry pit. The boys went out to play in the afternoon, did not return as expected, and ultimately were found to have journeyed to the quarry pit, ventured out on the ice, and met their deaths.

There was conflicting evidence on the issue of whether the defendant should have realized the likelihood of child trespassers. There was testimony that some neighborhood children used to swing upon vines or ropes hanging from trees (generally referred to as "Tarzan Swings") inside the gate of the defendant's property. However, this area was some distance removed from the area of the pond. There was also testimony by a number of neighborhood children that they had at various times explored the woods on the property, and engaged in various forms of play there-

on; and some of these children testified that they had visited the pond at various times. On the other hand, most of them also testified that they were careful to remain out of sight, whenever any of the defendant's employees were nearby; and on the few occasions when they were observed, they were ordered off the property. The local chief of police testified that his department had received several calls from the defendant's employees at various times, complaining about child trespassers on the property; the defense witnesses denied any knowledge of any such complaints, and there appears to have been no departmental record of any such complaints.

## I.

■ In support of plaintiffs' motion for a new trial, it is urged that the trial judge erred in excluding from evidence copies of certain ordinances of Plymouth Township. Ordinance No. 223 entitled "An ordinance requiring the fencing of quarries and other excavations and imposing penalties for violations" enacted April 5, 1954, provides as follows:

"SEC. 1. Fences and Signs: Where any quarry or other excavation is located adjacent to a highway, school, church, park, playground or dwellings, a protective fence at least four feet in height shall be placed around such portions of the rim of the quarry, or excavation as constitute a hazard to the life or safety of persons. Warning signs shall likewise be posted. It shall be the duty of the Chief of Police to fix and determine the locations where such fences and signs shall be erected, and to give written notice to the owner and to the tenant or occupant of any property when he deems it necessary that a fence and signs be erected for the protection of the public and it shall be the duty of such owner, or the tenant or occupant thereof to comply promptly with such notice in accordance with the terms thereof."

It was virtually conceded by counsel at one point in the trial that the defendant was not in violation of this ordinance at the time of the accident. While counsel's later trial argument, and his present argument, seem to represent a departure from the original concession, it is quite clear that his original position was correct. The ordinance relates only to quarries and other excavations "located adjacent to a highway, school, * * * playground or dwellings. * * *" The defendant's quarry obviously was not within that description. Moreover, the fencing is required only around "such portions of the rim of the quarry or excavation as constitute a hazard to the life or safety of persons" as determined by the chief of police. The only duty imposed upon the property owner by the ordinance is to comply with any such notice from the chief of police. It is, of course, undisputed that in the present case no such determination had ever been made, and no such notice had ever been given.

Counsel for the plaintiffs is apparently trying to read into the ordinance a provision requiring property owners to notify the chief of police of all excavations on their property, and obtain a ruling as to whether or not any further fencing or warning signs would be required under the ordinance. Of course, the ordinance says nothing of the sort.

If there had been any evidence presented which would justify the conclusion that the defendant was in violation of the ordinance of the township, then the ordinances [1] should have been received in evidence, pursuant to § 286 of the Restatement of Torts, 2d. But I am satisfied that there was no such evidence in the present case; that, as a matter of law, the defendant was not in violation of the ordinance at the time of the accident; and that the admission of these ordinances into evidence would have merely confused matters.

Plaintiffs further complain that a new trial should be granted because the

---

1. The other Ordinance offered merely amended the penalty provisions of Ordinance No. 223.

court initially refused to receive in evidence certain photographs of the defendant's property taken long after the accident, showing the pond being filled in. I am satisfied that this ruling was correct, but inasmuch as these photographs were ultimately received in evidence it is unnecessary to pursue this question further, and I find counsel's present argument completely incomprehensible. The same observation may be made with respect to counsel's present allegation that he was precluded from presenting evidence that the defendant had the manpower and equipment before the accident which would have enabled the defendant to eliminate the alleged hazard at virtually no expense. In the first place, ample evidence to that effect was presented before the close of the testimony; in the second place, the point was virtually conceded; and finally, under the circumstances of the case, such evidence was really irrelevant. Since everyone agreed that the quarry or water hole had absolutely no utility to the defendant, the court charged the jury, in effect, that the requirements of subsection (d) of Section 339 of the Restatement had been established. (This interpretation of subsection (d) is, of course, not strictly accurate; but it is favorable to the plaintiffs, and served to simplify the issues at trial.)

■ The matters covered by defendant's answers to plaintiffs' supplemental interrogatories numbered one and two were established on the record by testimony, and I therefore fail to understand how plaintiffs can claim to have been prejudiced by the rejection of these answers as such. Moreover, plaintiffs were obviously trying to get before the jury, improperly, the idea that the filling in of the quarry after the drownings amounted to evidence of antecedent negligence. The suggestion now made, that the jury should have been permitted to interpret these interrogatories and the corresponding answers as relating to the situation existing before the drownings, goes far beyond the permissible scope

of advocacy; it merits no further discussion.

Plaintiffs offered in evidence interrogatories 25 and 36, and defendant's answers thereto. Interrogatory 25 sought the names and addresses of "all persons participating, each and every activity authorized by defendant on the premises involved in this accident from and after defendant acquired title thereto", while interrogatory 36 sought the frequency with which officers, stockholders and employees of the defendant "passed or entered upon the property involved in this accident."

Inasmuch as both interrogatories referred to "the property involved in this accident" without making it clear whether the reference was intended to cover only the area of the pond, or the entire property, the proffered evidence was so ambiguous as to be meaningless. There was full development in the testimony of all relevant aspects of this subject.

■ I also believe it was proper to reject plaintiffs' offer in evidence of the averments of the defendant's third-party complaint, charging the third-party defendants (the parents of one of the boys) with knowledge that "trespassing on this defendant's property involved a risk to the decedent." In context, this was clearly intended as alternative pleading, and could not reasonably be interpreted as an admission, particularly since the existence of a dangerous condition had expressly been denied throughout the defendant's pleadings. I believe this ruling was completely in accord with Giannone v. United States Steel Corporation, 238 F.2d 544, 547 (3d Cir. 1956) and the various other cases referred to by the plaintiffs' counsel.

II.

The next series of complaints relate to the charge to the jury. Counsel took no exceptions to the charge, and has therefore found it necessary to assert that the errors complained of constitute fundamental error. There is no merit to this argument.

■ In referring to the requirements of subsection (a) of § 339 of the Restatement, I did, at one point, speak in terms of actual knowledge that children would be likely to trespass, inadvertently omitting "or has reason to know". But this occurred only once in the course of the charge, whereas the correct terminology was read to the jury and expounded upon repeatedly, and the precisely correct terminology was employed in the special interrogatories submitted to the jury on this point. If there is a difference, in this context, between knowing what children are likely to do, and having reason to know what they are likely to do, it is nebulous at best. In any event, there can be no doubt that the charge as a whole gave the jury the correct criterion.

Several times in the course of the charge, I used interchangeably the terms "children" and "young children." From the very fact that these two terms were used interchangeably throughout the charge, I am satisfied that the jury could not have been under the impression, as plaintiffs' counsel now seems to argue, that there was some meaningful distinction between the two terms on the issue of defendant's realization of the likelihood of child trespassers, or on the issue of unreasonable risk, etc.

■ Complaint is made of the affirmance of defendant's point for charge No. 7, which contains the language "if you find that the defendant did not know or should not have known that the condition involved an unreasonable risk of harm to trespassing children, then your verdict must be for the defendant." It is contended that this constituted, in the words of plaintiffs' brief "an offer to the jury to exonerate the defendant in the absence of actual knowledge in spite of the presence of facts showing that it had constructive knowledge of the presence of an unreasonable risk."

In the first place, the point was obviously intended, and no doubt understood by the jury, in the sense of "if the defendant neither knew nor should have known * * *". More important, however, is the fact that this point was only mentioned casually, with the comment that it had certainly been covered previously by the charge; and the charge contains numerous correct statements of the point. And finally, the special interrogatory submitted to the jury correctly expressed the legal issue involved, and could not be regarded as subject to this charge of grammatical ambiguity.

■ Plaintiffs also now suggest various possible infirmities in the draftmanship of the special interrogatories. The case was submitted to the jury on October 11, 1966. At the close of the previous day's testimony, counsel were advised that it was the court's intention to submit special interrogatories to the jury to pinpoint the issues involved, and counsel were invited to give some thought to the matter during the ensuing overnight recess, and were in effect invited to submit sample forms of interrogatories. The next day, before the closing speeches or charge, counsel were given an opportunity to review the interrogatories proposed to be submitted; counsel did so, and the interrogatories which were actually submitted to the jury[2]

2. Five interrogatories were used:
   1. On the date of the accident, was the location of the accident a place where the Defendant knew or should have known that young children were likely to trespass?
   2. On the date of the accident, did the water hole as it then existed present an unreasonable risk of death or serious bodily harm to young children trespassers?
   3. If your answer to (2) is "yes", did the Defendant know or realize, or should it have known or realized, that this unreasonable risk existed?
   4. Did the Defendant fail to exercise reasonable care to eliminate the danger or otherwise to protect the children?
   5. Were the children who drowned unaware of the danger and risk involved in going out on the ice on this pit or pond?

   The jury answered No. 5 "Yes", and all the rest "No."

were not objected to, nor were any of the presently alleged defects pointed out. Under these circumstances, it is clearly too late for counsel to complain about the wording of the special interrogatories. But be that as it may, I am of opinion that the interrogatories submitted were proper in form and substance, and there is no merit to any of plaintiffs' present arguments.

### III.

At the close of the plaintiffs' evidence, the defense made an appropriate motion under Rule 50, and renewed it at the close of all the evidence. Ruling thereon was deferred, and the case submitted to the jury. I am now of the view that this motion should have been granted.

It is agreed that the boys were trespassing upon the defendant's property at the time of the accident, and that the only conceivable basis for liability is that set forth in § 339 of the Restatement. It should be noted that the legal principles declared in this section impose liability to child trespassers only if the harm is caused by "an artificial condition upon the land." Much of the testimony at trial was devoted to the issue of whether defendant's quarry pit falls within that description. When the evidence was all in, it was apparent that there was no factual dispute underlying this issue: all of the evidence on both sides was to the effect that the hole itself, i. e., the physical depression in the land, was originally man-made, caused by quarrying or mining operations; that it had been in existence for at least one hundred years; and that the water in the quarry represented natural accumulations of surface water. From the fact that trees had grown in the bottom of the depression it is apparent that the pit had not always contained water. The experts theorized that clay and silt had gradually formed a waterproof seal, preventing the escape of rain and surface water. There was no suggestion that any activities on the part of those in possession of the defendant's property had caused or contributed to the accumulation of water in the pit. Indeed, the topographical data would seem to indicate that this would have been impossible.

The authors of the Restatement saw fit to include this caveat:

"The cases give no satisfactory answer to the question, whether the rule stated in this section [section 339] applies to natural conditions on land. There are six cases which have said it does not * * * [citations omitted]. * * *

"There are numerous other cases of artificial ponds and other artificial conditions which duplicate natural conditions, in which this has been given as one reason among others for denying liability * * * [citations omitted]"

Three Pennsylvania decisions are especially pertinent here. Mussolino v. Coxe Brothers & Co., Inc., 357 Pa. 10, 53 A.2d 93 (1947) involved an accidental drowning in a pond which had been formed when water accumulated and remained in a depression left by coal-stripping operations several years earlier. The court held that the entry of a compulsory non-suit was improper, and that the plaintiffs should have been permitted to show that the pond and the surrounding property had been frequented by playing children for such a long time as to justify the inference that the decedent had implied permission to be on the property at the time of the accident. The opinion seems to indicate that such a pond could constitute the kind of condition referred to in Section 339, although it is not entirely clear whether the court regarded the condition as artificial rather than natural, or concluded that the distinction was immaterial.

In McGuire v. Carey, 366 Pa. 627, 79 A.2d 236 (1951), another child-drowning case, recovery was denied, squarely on the basis that the condition which caused the harm was natural rather than artificial. The Supreme Court stated at 628, 79 A.2d at 237:

"Plaintiffs concede that Meadow Brook is a natural stream but contend

that because of a culvert through which it passes under a street and because of some blasting which occurred eight years prior to the accident, an artificial pool was created in which the boy drowned. However, none of plaintiffs witnesses testified that any such artificial condition existed. On the contrary, the uncontradicted evidence discloses that except for natural erosion and seasonal variations in depth the stream had remained unchanged for at least forty years. The record shows that neither the blasting nor the culvert had caused any material change in the stream. Certainly from that evidence it is clear that defendant was not maintaining an artificial condition on her land within the meaning of Section 339. * * * "

The converse of this situation was presented in Hyndman v. Pennsylvania R. R. Co., 396 Pa. 190, 152 A.2d 251 (1959). It is to be noted that the emphasis in the cited cases falls upon the presence or absence of activities by the defendant, leading to the creation or continued existence of the condition; and from that aspect, the present case more strongly resembles *McGuire* than *Mussolino* or *Hyndman*.

■ Assuming for present purposes that under Pennsylvania law the pond in this case should be regarded as within the sphere of potential liability under Section 339, I am nevertheless of opinion that recovery should be denied, as a matter of law. The theory of Section 339 is not strict liability, but negligence. Jesko v. Turk, 421 Pa. 434, 436, 219 A.2d 591 (1966); Hyndman v. Pennsylvania R. R. Co., 396 Pa. 190, 197, 152 A.2d 251 (1959). Viewing the record as a whole, I am convinced that the plaintiffs failed to sustain their burden of proving negligence.

Considering the interior location of the pond, its remoteness from residences, streets, and playgrounds, and the dense undergrowth surrounding it, I believe it would be utterly unreasonable to conclude that it constituted an unreasonable risk of harm to trespassing children, or that the defendant should have so realized. I note also that, upon careful analysis, there is no evidence whatever in this record that any child was ever seen or known to be in the vicinity of the pond, by any adult; and the evidence as to the observed presence of children anywhere on defendant's property is very meager. As an indication of the extent of the known use of this property by neighborhood children, it is not without significance that, when the boys were reported missing, an extensive search was underway for several hours before anyone thought to search in the area of the quarry.

In short, I am convinced that the jury reached the only proper verdict, and that any other verdict could not have been permitted to stand. It should be unnecessary to state that the foregoing conclusions are based upon the evidence as to what the situation was at and immediately prior to the date of the accident. Plaintiffs' brief of argument, echoing to some extent the trial tactics of plaintiffs' counsel, betrays an unfortunate tendency to telescope subsequent events and activities on the property into the pre-existing situation, and to obscure the evidentiary realities of the case by the use of self-serving labels and sweeping generalizations.

An order will be entered refusing a new trial, and noting of record that the defense motion for judgment[3] would otherwise be granted.

---

3. By virtue of trial rulings no longer challenged, the only remaining defendant is the corporate defendant, and the third-party action has been dismissed.